# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

**UNITED STATES OF AMERICA**
 **ex rel. DR. TODD SCARBROUGH,**
　　　Plaintiff,

**v.**　　　　　　　　　　　　　　　　**Case No. 1:22-cv-1533-CLM**

**ALABAMA CANCER CARE, LLC,**
***et al.,***
　　　Defendants.

## MEMORANDUM OPINION

On behalf of himself and the United States, Dr. Todd Scarbrough sues his former employer, Alabama Cancer Care, LLC, as well as Dr. Shelby Sanford and Dr. Ashvini Sengar, asserting that they knowingly defrauded the United States by billing Medicare for radiation oncology services that were never performed or medically unnecessary. (Doc. 1). Defendants move to dismiss Scarbrough's complaint, asking the court to find that each False Claims Act count that Scarbrough brings against them either fails to state a claim or meet Rule 9(b)'s particularity requirements. (Docs. 21 & 22).

For the reasons stated within, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions (docs 21 & 22). The court **GRANTS** Defendants' motions to dismiss:

1. The radiation treatment management claims against Sengar;
2. The IMRT services claims against each Defendant; and
3. The reverse false claims count.

The court **DENIES** Defendants' motions in all other respects. Each dismissal is **without prejudice**, and Scarbrough has until on or before **March 6, 2025,** to file an amended complaint that corrects the pleading deficiencies noted below.

## BACKGROUND

Because Defendants seek to dismiss Scarbrough's complaint under Rule 12, the court states the facts as Scarbrough pleads them in his complaint and assumes that his alleged facts are true. *See* Fed. R. Civ. P. 12(b)(6); *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984).

Defendant Alabama Cancer Care ("ACC") is an oncology and hematology practice based out of Gadsden that operates in 10 locations throughout Alabama. (Doc. 1, ¶ 6). Dr. Ashvini Sengar is a hematologist and medical oncologist who is the majority owner of ACC and who mainly practices in ACC's Anniston, Gadsden, and Ft. Payne locations. (*Id.*, ¶ 8). Dr. Shelby Sanford is a radiation oncologist who mainly practices in ACC's Tuscaloosa and Winfield locations (*Id.*, ¶ 7).

Scarbrough is a radiation oncologist who worked at ACC as an independent contractor from January 2017 to May 2022. (*Id.*, ¶ 9). Scarbrough primarily practiced at ACC's Anniston and Ft. Payne locations and says that through this experience he learned that ACC participated in three schemes to defraud Medicare:

- Billing for radiation treatment management under CPT code 77427 that was never provided.

- Billing for computed tomography (CT) diagnostic services that were never reviewed by a physician as required by Medicare conditions of payment and forging and falsifying documentation to substantiate billing for such services.

- Billing for IMRT services, performed using equipment that was unsafe and not properly verified as safe and effective under Medicare requirements.

(*Id.*, ¶¶ 9, 41). Before discussing these alleged fraudulent schemes in more detail, the court will explain (a) what radiation oncology services are, (b) Medicare's requirements, and (c) ACC's billing practices.

## I.     Radiation Oncology

Radiation therapy is the use of ionizing radiation to destroy or inhibit the growth of malignant tissues. (*Id.*, ¶ 32). Radiation therapy can be successfully used to treat most types of cancers, including malignant tumors of different organs and certain non-malignant conditions, so radiation therapy with either curative or palliative intent is used to treat up to 60% of all patients with cancer. (*Id.*, ¶ 31).

Radiation therapy requires collaboration between the radiation oncologist, the Qualified Medical Physicist, and other personnel like radiation therapists. (*Id.*, ¶ 34). A radiation treatment plan is developed and led by the radiation oncologist who is a licensed physician—with specialized training and experience in radiation oncology. (*Id.*, ¶ 35). The radiation oncologist determines the radiation dose to be delivered to the cancerous area, or "target site," and the limiting constraint doses to organs at risk. (*Id.*, ¶ 36). The total radiation dose is broken up into separate treatments or "fractions." (*Id.*). During a radiation treatment episode, most patients receive a "fraction" four to five days per week and the treatment episode typically lasts for several weeks. (*Id.*). The radiation oncologist determines the appropriate fraction schedule and radiation dose per fraction. (*Id.*).

Radiation treatment is carried out by the radiation therapist following the prescription and treatment plan of the radiation oncologist. (*Id.*, ¶ 38). But patient evaluation and physical examination by the radiation oncologist during treatment should be performed weekly or once every five fractions, whichever frequency is greater, and more often when warranted. (*Id.*, ¶ 40). As part of monitoring the patients' progress, the radiation oncologist should also review pertinent laboratory and imaging studies. (*Id.*).

## II.     Medicare's Requirements

The Center for Medicare and Medicaid Services ("CMS") oversees the administration of Medicare. (*Id.*, ¶ 16). Under Medicare "Part B," CMS covers physician and qualified non-physician practitioner ("NPP") services and outpatient care. (*Id.*, ¶ 17). Federal government funds help pay for these covered services and supplies when they are medically necessary. (*Id.*). Through Medicare "Part C," CMS authorizes private insurers to offer health

insurance plans to individuals who are eligible for Medicare and Medicaid. (*Id.*, ¶ 18). The private insurance plans offered through Medicare Part C are also paid in full by federal government funds. (*Id.*, ¶ 19).

Medicare Part B and C cover many medically necessary cancer related outpatient services and treatments, which are provided in free-standing outpatient clinics like those that ACC operates. (*Id.*, ¶ 20). To receive reimbursement for these services, a provider must describe the service provided using CMS's Healthcare Common Procedure Coding System ("HCPCS"), which is based on the American Medical Association's Current Procedural Terminology ("CPT") codes. (*Id.*, ¶ 22). So each billable service corresponds to a specific CPT code used to describe that service. (*Id.*). The CPT codes at issue here are CPT Code 77427 (Radiation Management Treatment); CPT Code 77014 (review of Computed Tomography images); and CPT Codes 77301, 77338, G6015, and G6016 (Intensity Modulated Radiation Therapy). (*Id.*, ¶ 23).

To enroll as Medicare providers, Defendants had to certify in either a Form 855I or 855B that they understood that Medicare conditioned the payment of claims on compliance with Medicare laws, regulations, and program instructions and that they agreed to abide by these requirements. (*Id.*, ¶ 24). To claim reimbursement from Medicare, physicians, NPPs, and medical practices must submit CMS Form 1500, a standard claim form. (*Id.*, ¶ 25). Each time Defendants submitted claims for reimbursement, they certified that the claim was true, accurate, and complete, and that Defendants had complied with all Medicare laws, regulations, and program instructions for payment. (*Id.*). They also certified that "the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee . . . ." (*Id.*).

Medicare and Medicaid pays only for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." 42 U.S.C. § 1395y(a)(1)(A). A service is not "reasonable and necessary" if the service has not been proven safe and effective based on authoritative evidence or is not generally accepted in the medical community as safe and effective for the condition for which it is used. 54 Fed. Reg. 3402, 4304 (Jan. 30, 1989).

## III.   Billing Practices

To bill Medicare, an ACC medical assistant in the specific agency where the service was performed inputs CPT codes into ACC's EMR system, referred to as "Varian Aria." (Doc. 1, ¶ 73). Then ACC's central billing office, supervised by employee Kristie Gholston, reviews all the codes submitted. (*Id.*, ¶ 74). Ms. Gholston or one of the other central billing employees, such as Arlette Fernandez, approves and submits the claims to Medicare and other payors. (*Id.*). These claims are typically submitted soon after the service is performed but no later than 90 days after the service is performed. (*Id.*).

## IV.   The Alleged Fraud

Scarbrough alleges that ACC defrauded Medicare in three ways.

### A. Claims for Radiation Treatment Management (Code 77427)

First, Scarbrough says ACC improperly billed Medicare for radiation treatment management under CPT Code 77427. CPT Code 77427 requires and includes at least one examination of the patient by the physician for medical evaluation and management (e.g., assessment of the patient's response to treatment, coordination of care and treatment, review of imaging and/or lab test results with documentation) for each reporting of the radiation treatment management service. (*Id.*, ¶ 45). The required examination component of this CPT Code means that the radiation oncologist billing for these services must personally visit with the patient once every five fractions. (*Id.*, ¶¶ 46–47).

Despite this face-to-face encounter requirement, Sanford and Sengar, through ACC, knowingly billed for thousands of claims under CPT Code 77427 without providing the in-person physical evaluation required to bill for this Code. (*Id.*, ¶ 48). According to Scarbrough, this means that Defendants billed Medicare for (a) services that were never provided, and (b) services that were not reasonable nor medically necessary. (*Id.*, ¶ 51).

1. *Sanford*: Sanford's lack of patient care and fraudulently billed radiation treatment management services were well-known within ACC's organization. (*Id.*, ¶ 52). In March 2018, Scarbrough had a recorded conversation with ACC Director Kevin Baker who told him that Sanford never sees his patients and that this has always been Sanford's practice. (*Id.*, ¶¶ 52,

56). Baker learned of Sanford's lack of patient care after he instructed Tuscaloosa ACC employees that the main component of CPT Code 77427 was that the "physician has to physically see the patient in the room." (*Id.*, ¶¶ 53, 56). These instructions raised red flags for the Tuscaloosa employees, who were accustomed to Dr. Sanford's practice of never performing the required face-to-face encounter with patients. (*Id.*, ¶ 54). One Tuscaloosa employee responded to Baker by emailing, "so because the physician does not actually see the patient in the room every five fractions, then we cannot bill this code, am I understanding this correctly?" (*Id.*).

Baker's email "pissed off" ACC's management, including Sengar and Samford. (*Id.*, ¶ 55). Rather than refund Medicare for Sanford's false CPT 77427 billings, Senger silenced anyone who openly discussed the mandatory billing requirements for Code 77427. (*Id.*, ¶ 57). For example, Sengar told Baker "that he caused a lot of problems with that email" and that Baker "should have never sent that email." (*Id.*, ¶ 58). Sengar also instructed Baker to never discuss or describe the face-to-face billing requirements of CPT Code 77427 in email or other written communications. (*Id.*). And based on instructions from Sengar and Samford, Deanna Oswalt, the lead administrative employee in Tuscaloosa, instructed lead therapist Calvin and other Tuscaloosa employees that they should disregard instructions of compliant billing of Code 77427. (*Id.*, ¶ 59). She instead said that "she was their boss and they should do as they were told." (*Id.*).

Medicare billing data shows that Sanford has billed and received payments for thousands of claims under Code 77427 for which he never saw the patient face-to-face. (*Id.*, ¶ 60). For example, in 2020, Sanford and ACC billed Medicare for 602 claims under Code 77427 at a submitted charge of $400 each. (*Id.*, ¶ 61). Medicare paid an average of $150.14 for each of these 602 false claims. (*Id.*).

2. *Sengar*: Defendants' false billing of radiation treatment management under Code 77427 extends beyond just Sanford. (*Id.*, ¶ 66). Throughout Scarbrough's tenure at ACC, Drs. Sengar and Sehbai instructed billing employees that whenever Dr. Scarbrough was not present in the office, the Anniston billing employees should bill Medicare for Radiation Treatment Management services under Code 77427 for Sengar and Sehbai. (*Id.*, ¶¶ 66–

67). According to Anniston office medical assistant Shelby Brodeur, Sengar and Sehbai never saw patients as required when they had the billing employees bill Medicare for radiation treatment management under Code 77427. (*Id.*, ¶ 67).

In 2020, Sengar and ACC billed Medicare for 28 claims under Code 77427 at a submitted charge of $400 each. (*Id.*, ¶ 69). Medicare paid Dr. Sengar and ACC an average of $149.15 for each of these claims. (*Id.*).

## B. Claims for Image-Guided Radiation Therapy (Code 77014)

CPT Code 77014 corresponds with review of radiation oncology CT scans and is called "CT Guidance for placement of radiation therapy fields." (*Id.*, ¶ 77). Scarbrough alleges that ACC routinely improperly accessed his electronic medical records ("EMR") account and NPI number to bill for thousands of services under CPT Code 77014 as though they were personally performed by Scarbrough when they were not. (*Id.*, ¶ 93).

CMS classifies CPT Code 77014 as a diagnostic test. (*Id.*, ¶ 79). All "diagnostic tests must be ordered by the physician who is treating the beneficiary." 42 C.F.R. § 410.32(a). The treating physician is the "physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." *See id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

Plus, "all diagnostic x-ray and other diagnostic tests . . . payable under the physician fee schedule must be furnished under the appropriate level of supervision by a physician." 42 C.F.R. § 410.32(b)(1). CMS has established three levels of supervision for the provision of diagnostic tests: General Supervision, Direct Supervision, and Personal Supervision. *See* 42 C.F.R. § 410.32(b)(3). Like most diagnostic tests, CPT Code 77014 consists of two components: the technical component and the professional component. (Doc. 1, ¶ 87). The technical component includes the provision of all equipment, supplies, personnel, and costs related to the performance of the CT scan and requires direct supervision. (*Id.*, ¶ 88). The professional component includes the treating physician's review, assessment, and interpretation of the CT scan image. (*Id.*, ¶ 89). Because the professional component must be performed by

the treating physician personally and cannot be delegated, the concept of physician supervision does not apply. (*Id.*).

As done by ACC, the technical and professional components can be billed together as one "global code" under 77014. (*Id.*, ¶ 90). Because the global code of 77014 includes the professional component, the performance of the procedure cannot be delegated but must be personally performed by the physician. (*Id.*). So to bill Medicare for CPT Code 77014 a physician must (1) order the CT scan and document the physician's intent in the medical record that the CT scan be performed; (2) exercise direct supervision over the technical component of the CT scan; and (3) personally review, interpret, and consider the results of the CT scan before the patient's next fraction and, if necessary, modify the patient's radiation treatment. (*Id.*, ¶ 91). But if anyone does it, ACC's radiation technicians—not the physicians—review, interpret, and consider the results of CT scans that ACC bills under CPT Code 77014 (*Id.*, ¶ 92).

Before Scarbrough learned that ACC used his EMR account and NPI number to bill Medicare under CPT Code 77014, he generally knew that ACC technicians captured CT images. (*Id.*, ¶ 94). But Scarbrough did not review the images as required to bill for Code 77014 and did not adjust the patients' radiation treatment based on the results of the CT images. (*Id.*). Because Scarbrough knew that he was not providing the services required to legally bill for Code 77014, he believed that ACC was not billing Medicare. (*Id.*, ¶ 95). So Scarbrough was shocked to learn that ACC employees had electronically signed hundreds of CT images under Scarbrough's electronic signature despite Scarbrough's lack of knowledge these services were being billed. (*Id.*, ¶ 96).

Scarbrough also learned that the employees who signed treatment records under his name for Code 77014 never signed the images before the next fraction. (*Id.*, ¶ 97). So Scarbrough says that these images were wholly medically unnecessary because they were not reviewed by anyone until days or months after the radiation therapy that was purportedly informed by the CT image. (*Id.*, ¶ 98). For example, patient C.B., who was insured by Medicare, received radiation treatment starting on April 1, 2019. (*Id.*, ¶ 100). C.B. received one fraction per day from April 1 to April 12. (*Id.*). Before each treatment, C.B. received a CBCT image, which was billed to Medicare under

Scarbrough's NPI number. (*Id.*). But Scarbrough had no idea ACC was billing Medicare for these CBCT images, and Scarbrough did not sign the images as required to bill for this service. (*Id.*). Instead, one of the radiation technicians at the Anniston Office signed the images—weeks after the service was performed. (*Id.*).

### C. Claims for IMRT Services (Codes 77301, 77338, G6015, G6016)

1. *IMRT requirements*: Scarbrough finally asserts that ACC does not perform the reasonable and necessary quality assurance required for intensity modulated radiation ("IMRT") services. IMRT services is a highly specialized form of radiation therapy that involves a computer-based method of planning for, and delivery of, narrow patient specific modulated beams of radiation to solid tumors within a patient. (*Id.*, ¶ 108). With IMRT treatment, exacting Quality Assurance ("QA") is necessary to achieve the preferred radiation dose distribution with accuracy and reproducibility. (*Id.*, ¶ 110). Thus, patient specific QA is expected to be performed to receive Medicare reimbursement for IMRT services, which include some of the most expensive services in radiation oncology. (*Id.*).

A critical component to the required patient specific QA process is "Dose Delivery Verification." (*Id.*, ¶ 119). For this process, a qualified medical physicist should ensure verification of the radiation doses being received during treatment. (*Id.*). Before the start of each patient's course of treatment, accuracy of dose delivery should be documented delivering a test dose of radiation to a phantom. (*Id.*). A phantom is a mass of material used to mimic human tissue and contains a calibrated dosimetry system to verify that the dose delivered is the dose planned. (*Id.*, ¶ 120). So the required patient specific QA for IMRT typically involves performing the planned radiation dose delivery for each patient before beginning the course of treatment. (*Id.*, ¶ 121). This testing procedure is called "patient-specific end-to-end testing," and either this test or an alternative test that provides equivalent verification is required for safe and effective IMRT delivery. (*Id.*, ¶¶ 121–22).

Performing IMRT without performing patient specific end-to-end testing QA using a phantom, or other equivalent testing procedures, is not generally accepted in the medical community as safe and effective. (*Id.*, ¶ 124). And

Medicare mandates patient-specific QA as a material condition of payment for IMRT services (*Id.*, ¶ 125). For example, Medicare Local Coverage Determination L36711 states that "medical documentation maintained by the provider must indicate the medical necessity for IMRT . . . and must include: Documentation of fluence distribution recomputed in a phantom, or equivalent methodology consistent with patient specific IMRT treatment verification." (*Id.*). So Medicare conditions payment for IMRT services on providers performing verification of radiation therapy in a phantom or through an equivalent patient specific IMRT treatment verification. (*Id.*, ¶ 126).

2. *ACC's procedures*: Beginning in January 2016, ACC clinics changed their QA verification process to remove patient specific QA procedures. (*Id.*, ¶ 129). Sanford and Keith Mills, ACC's physicist, made this decision to cut costs and increase revenue. (*Id.*, ¶¶ 129–30). The new IMRT QA process is done solely through software verification, with physical spot checks done quarterly. (*Id.*, ¶ 131). Scarbrough says that relying only on software to ensure that dosages of dangerous radiation are properly administered to each patient is, at best, half of the required process, which requires both software and physical verification for each patient. (*Id.*).

ACC's QA process does not involve verifying the radiation delivery machines via phantoms or film measurement. (*Id.*, ¶ 132). Instead, ACC only checks the physical measurement quarterly. (*Id.*, ¶ 133). Proper and required QA systems must not only check whether the software is working, but also ensure that the radiation delivery machine itself is working properly and free of malfunctions. (*Id.*, ¶ 134). Plus, ACC's "software-only" QA system does not detect whether there is human error in setting up and stabilizing the specific patient before treatment. (*Id.*).

In April 2017, Scarbrough questioned Mills about the lack of patient specific IMRT QA procedures. (*Id.*, ¶ 135). Scarbrough copied Sanford and Sengar on this email exchange and informed them that ACC's QA process was deficient and in violation of Medicare Conditions of Payment. (*Id.*). Scarbrough provided ACC with the Medicare Local Coverage Determination requirements for IMRT QA that showed that documentation of fluence distribution recomputed in a phantom is required and highlighted that ACC's procedures do not meet this requirement. (*Id.*, ¶ 136).

Mills responded by acknowledging that ACC's procedures did not assess the physical characteristics of the radiation machine or the specific patient set-up and positioning. (*Id.*, ¶ 137). Instead, Mills performs verifications on a standard phantom within the software Radcalc. (*Id.*). Scarbrough says that there are two problems with Mills' approach. First, a standard phantom is not equivalent to the patient specific requirements because not all patients are the same and patients receive radiation therapy for different cancers that impact different organ systems. (*Id.*, ¶ 138). Second, performing only software verifications is not equivalent to a true patient specific phantom because the software cannot verify that the machine is functioning properly and that the specific patient is set up and stabilized to properly receive safe and effective radiation treatment. (*Id.*).

Again, ACC removed patient specific IMRT QA procedures at all ACC facilities in January 2016. (*Id.*, ¶ 142). So Scarbrough says that each ACC claim submitted after January 2016 for CPT Codes 77301, 77338, G6015, and G6016 (*i.e.*, the IMRT CPT Codes) were false. (*Id.*). For example, Scarbrough asserts that the 69 claims Sanford submitted in 2018 for Code 77301 were false. (*Id.*, ¶ 145). Sanford submitted an average charge of $2,474.39, and Medicare paid ACC an average of $1,433.72 for each of these 69 claims. (*Id.*).

## V.    The Complaint

Scarbrough pleads five counts against Defendants under the FCA. Count 1 alleges that ACC violated 31 U.S.C. § 3729(a)(1)(A) by presenting or causing to be presented false claims for each of the three alleged schemes. Count 2 asserts that Dr. Sanford violated § 3729(a)(1)(A) by submitting or causing to be submitted false claims for radiation treatment management under CPT Code 77427 and IMRT services under CPT Codes 77301, G6015, and G6016. Count 3 contends that Dr. Sengar violated § 3729(a)(1)(A) by submitting or causing to be submitted false claims under CPT Code 77427 and IMRT services under CPT Codes 77301, 77338, G6015, and G6016. Count 4 alleges that ACC, Sanford, and Sengar made or used false statements or records material to their false claims in violation of § 3729(a)(1)(B). And Count 5 brings a reverse False Claims Act claim under § 3729(a)(1)(G) against ACC, Sanford, and Sengar, asserting that these Defendants knowingly avoided an obligation to refund the United States the payments they received because of their false claims.

## STANDARDS OF REVIEW

Rule 12(b)(6) allows the court to dismiss a complaint if it fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In a False Claims Act action, the court must judge the sufficiency of the complaint under the pleading requirements of both Rule 8 and Rule 9(b). *See Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015).

1. *Rule 8(a)*: Rule 8's general pleading requirement is that the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a). Rule 8 does not require "detailed factual allegations," but does demand more than "an unadorned, the-defendant-unlawfully-harmed me accusation." *Iqbal*, 556 U.S. at 678 (quotations omitted). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Id.*

2. *Rule 9(b)*: Under Rule 9(b)'s heightened requirements for pleading fraud, a plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this heightened-pleading standard in a False Claims Act action, the relator has to allege facts as to time, place, and substance of the defendant's alleged fraud, particularly the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Urquilla-Diaz*, 780 F.3d at 1051 (quotations omitted).

## DISCUSSION

Counts 1–4 assert false presentment and false statement claims. An essential element of each of these counts "is the actual presentment or payment of a false claim." *84Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353, 1360 (11th Cir. 2023). Defendants say that Scarbrough has failed to adequately allege this essential element for any count. So the court will address this overarching issue before it addresses other arguments specific to the three alleged schemes.[1]

---

[1] ACC and Sengar originally asserted in their motion to dismiss that the court should dismiss Scarbrough's complaint because the False Claims Act's qui tam device violates Article II of

## I.    Global argument: Submission of claims (Counts 1-4)

Submission of a false claim is "the *sine qua non* of a False Claims Act violation." *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002). So "that submission must be pleaded with particularity and not inferred from the circumstances." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005). Thus, under Rule 9(b), "some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made by the Government." *Clausen*, 290 F.3d at 1311.

The Eleventh Circuit evaluates "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006). "Providing exact billing data—name, date, amount, and services rendered—or attaching a representative sample claim is one way a complaint can establish the necessary indicia of reliability that a false claim was actually submitted." *Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014). "[A] relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may [also] have a sufficient basis for asserting that the defendants actually submitted false claims." *Id.*

### A. Claims for Radiation Treatment Management (Code 77427)

Scarbrough asserts that ACC, Sanford, and Sengar knowingly submitted, or caused to be submitted, false claims under CPT Code 77427 because they never performed the required face-to-face patient encounters but billed Medicare for their radiation treatment management services anyway (Counts 1–3). Scarbrough then alleges that Sanford and Sengar created false patient documents material to these false claims and that ACC used these false documents to make false billing submissions for CPT Code 77427 (Count 4).

Scarbrough says two things in his complaint establish that Defendants submitted false claims for CPT Code 77427: (a) his factual basis for believing Sanford and Sengar didn't see patients, and (b) Medicare billing data that shows that Sanford and Sengar billed for thousands of claims under CPT Code

the U.S. Constitution. (Doc. 21, pp. 35–39). But they have since withdrawn this argument, (*see* doc. 27), so the court doesn't address it.

77427 from 2016 to 2020.

1. *Sanford*: Here's an example of Scarbrough's Medicare billing data that shows that Sanford submitted 245 claims for an average of $400 each under CPT Code 77427:



(Doc. 22, p. 11) (circles added). According to Scarbrough, the billing data shows that in 2020, Sanford billed Medicare for 602 claims under Code 77427 at an average submitted charge of $400 each and that Medicare paid an average of $150.14 for each of these claims. (Doc. 1, ¶ 61).

Scarbrough alleges that each claim Sanford submitted under Code 77427 between 2016 and 2020 is false. To support this assertion, Scarbrough points to his recorded conversation with Baker in which Baker discussed how Sanford ***never sees his patients*** and that this ***has always been*** Sanford's practice. (Doc. 1, ¶¶ 52, 56). He also points out that a Tuscaloosa Alabama Cancer Care employee stated in an email that Sanford "does not actually see the patient in the room every five fractions." (*Id.*, ¶ 54).

Taken together, Scarbrough's allegations provide a sufficient indicia of reliability that Sanford submitted false claims to Medicare. Scarbrough states exactly which documents (each of Sanford's CMS 1500 claim forms under CPT Code 77427 from 2016 to 2020) and statements (Sanford performed the services required to bill under CPT Code 77427) he alleges are false. He also explains who billed Medicare—medical assistants input the CPT Code into

ACC's EMR system and central billing office employees approved and submitted the claims to Medicare. (*Id.*, ¶¶ 73–74). Scarbrough then provides specific reasons for his belief that Sanford submitted false claims: (a) his conversation with Baker that detailed how Sanford never sees his patients, and (b) Medicare billing data that shows that from 2016 to 2020 Sanford submitted hundreds of claims under CPT Code 77427, which requires face-to-face patient encounters. "Because these allegations are well-pled," this court "may accept them as true and conclude that a [false claim] was actually submitted." *Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012). Scarbrough does "not need to further support [his] well-pled factual allegations with some other 'factual basis,' such as personal knowledge of the submission or employment in" the billing department. *See id.*

2. *ACC (for Sanford)*: Scarbrough has also adequately alleged that ACC submitted false claims on behalf of Sanford for CPT Code 77427. As explained, Scarbrough has alleged with particularity the conversations, emails, and statements that support his belief that Sanford **never performs** the face-to-face encounters that CPT Code 77427 requires. Yet Medicare billing data shows that Sanford billed hundreds of claims under CPT Code 77427 from 2016 to 2020. And ACC medical assistants were the ones to input the CPT Code for radiation therapy management into the Alabama Cancer Care EMR system. (Doc. 1, ¶ 73). ACC central billing office employees would then review these codes and submit them to Medicare for payment. (*Id.*, ¶ 74). Thus, Scarbrough has alleged with particularity that Alabama Cancer Care submitted "a false or fraudulent claim" for radiation therapy management services under CPT Code 77427 "for payment or approval." *See* 31 U.S.C. § 3729(a)(1)(A).

3. *Sengar*: The court reaches the opposite result for Sengar. Scarbrough claims that Sengar submitted false claims to Medicare because (a) Medicare billing data shows that Sengar submitted claims for CPT Code 77427, and (b) Anniston medical assistant Shelby Brodeur told Scarbrough that Sengar didn't see patients as required to bill for radiation treatment management.

According to Brodeur, whenever Scarbrough wasn't present in the Anniston office Sengar instructed her to bill Medicare for radiation treatment management for Sengar under CPT Code 77427, even though Sengar never saw patients as required to bill for these services. (Doc. 1, ¶ 67). Brodeur would

then bill Medicare as if Sengar had performed radiation treatment management. (*Id.*). Scarbrough's allegations about what he learned from Brodeur state with particularity why he believes Sengar was engaged in a scheme to defraud the government. And the Medicare billing data establishes that Sengar did in fact bill Medicare for services under CPT Code 77427 from 2016 to 2020.

But Scarbrough hasn't adequately alleged a connection between the claims submitted to Medicare and Sengar's failure to perform face-to-face encounters. As pleaded, Brodeur's knowledge of Sengar not seeing patients is limited to times when Scarbrough was absent from the Anniston office. But Sengar practices in ACC's Anniston, Gadsden, *and* Ft. Payne offices. (*Id.*, ¶ 8). The Medicare billing data doesn't break down Sengar's claims for payment under CPT Code 77427 by office. It instead provides the aggregate number of claims Sengar submitted for any given year. So it's *possible* that each of the CPT Code 77427 Medicare claims from Sengar on CMS's website are for services rendered at ACC's Gadsden and Ft. Payne offices. If that's indeed the case, the court has no information about Ft. Payne and Gadsden because Brodeur's knowledge is limited to Anniston. That's especially problematic given that central billing office employees had to review and approve all CPT Codes Brodeur submitted for billing before submitting the claims to Medicare.

Submission of a false claim cannot "be inferred from the circumstances." *Corsello*, 428 F.3d at 1013. Nor is it enough to allege that "claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. So while it's possible (and even likely) that the Medicare billing data includes claims for the services at the Anniston office that Brodeur describes, Scarbrough hasn't adequately alleged that Sengar submitted a false claim to Medicare for radiation treatment management under CPT Code 77427.[2]

---

[2] The complaint asserts that Sengar submitted false claims "with knowledge ***that he never performed*** the required face to face patient encounter." (Doc. 1, ¶ 162 (emphasis added)). So Scarbrough hasn't alleged that Sengar caused Sanford to present false claims, and the court needn't address whether Sengar indirectly presented false claims through Sanford.

### B. Claims for Image Guided Radiation Therapy (Code 77014)

Scarbrough next asserts that ACC submitted false claims because from 2018 to 2020 Alabama Cancer Care billed Medicare under Scarbrough's NPI number for hundreds of claims under CPT Code 77014 when Scarbrough never reviewed the CT imaging services as required to bill under this Code (Count 1). Scarbrough also says ACC created or used false CT scan documentation that falsely claimed that Scarbrough had reviewed and signed the CT scan images. (Count 4).

Scarbrough's allegations about ACC's submission of claims under CPT Code 77014 satisfy Rule 9(b)'s particularity requirements. Scarbrough has direct, personal knowledge that from 2018 to 2020 he did not review CT images as required to bill for CPT Code 77014 and did not adjust his patients' radiation treatment according to the results of the CT images. (Doc. 1, ¶ 94). Yet Medicare billing data shows that from 2018 to 2020 hundreds of claims under CPT Code 77014 were billed to Medicare using Scarbrough's NPI number. (*Id.*, ¶¶ 102–04). These allegations satisfy Rule 9(b). *See Walker v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005).

But Scarbrough has alleged more. Scarbrough has also alleged with particularity how the alleged fraudulent scheme worked. ACC radiation therapists, including one therapist named in the complaint, had improper access to Scarbrough's EMR login information and signed images billed under Code 77014 for ACC physicians. (*Id.*, ¶ 99). A medical assistant, like Brodeur, would then input the CPT Code to be billed. (*Id.*, ¶ 73). And ACC central billing employees would review the codes and approve and submit the claims to Medicare. (*Id.*, ¶ 74).

Finally, Scarbrough has given examples of Medicare patients whose CT images he says ACC improperly billed Medicare for. For example, Scarbrough alleges patient C.B. received radiation treatment from April 1 to April 12, 2019. (*Id.*, ¶ 100(a)). For each treatment, C.B. received a CBCT image that ACC billed to Medicare under Scarbrough's NPI number. (*Id.*). But Scarbrough had no idea that ACC was billing Medicare for these CBCT images, and Scarbrough did not sign the image as required to bill for the service. (*Id.*). Instead, one of the Anniston office radiation technicians signed these images

under Dr. Scarbrough's name within ACC's EMR system. (*Id.*). Plus, the CBCT images weren't signed until weeks after the service was performed. (*Id.*). For example, a CBCT image performed on April 8, 2019, was not signed until May 21, 2019, rendering any purported review or adjustment of radiation based on this image medically unnecessary. (*Id.*).

In short, Scarbrough's complaint alleges "specific details that provid[e] the indicia of reliability necessary under Rule 9(b)" to find that ACC submitted false claims to Medicare under CPT Code 77014. *See 84 Partners*, 79 F.4th at 1362.

### C. Claims for IMRT Services (Codes 77301, 77338, G6015, G6016)

Scarbrough alleges that ACC, Sanford, and Sengar submitted false claims for IMRT services because required patient specific QA wasn't performed and thus the IMRT services weren't reasonable or medically necessary (Counts 1–3). Scarbrough also asserts that Defendants created or used false documentation that falsely claimed that ACC performed patient specific QA (Count 4).

1. *ACC*: Scarbrough alleges that in 2016 ***all*** ACC clinics changed their QA verification process to remove required patient specific QA procedures. (Doc. 1, ¶ 129). ACC's new QA process is done solely through software verification with physical spot checks done quarterly. (*Id.*, ¶ 131). According to Scarbrough, this new process doesn't meet Medicare's requirements for IMRT services for two reasons. First, a standard phantom is not equivalent to Medicare's patient specific requirement because not all patients are the same, and patients receive radiation therapy for different cancers that affect different organs. (*Id.*, ¶ 138). Second, performing software only verifications is not equivalent to a true patient specific phantom QA because the software cannot verify (a) that the machine is functioning properly, and (b) that the specific patient is set up and stabilized to properly receive safe and effective radiation treatment. (*Id.*).

Because Scarbrough alleges that ACC's new process doesn't follow the required patient specific QA procedures, he says that all ACC claims for reimbursement for IMRT services under CPT Codes 77301, 77338, G6015, G6016 since 2016 are false. (*Id.*, ¶ 128). And Medicare billing data establishes

that from 2016 to 2020 ACC physicians, such as Dr. Sanford, Dr. Beatrous, and Dr. Sehbai, billed Medicare under CPT Codes 77301, 77338, and G6015, and G6016. (*Id.*, ¶¶ 143–50).

These allegations, combined with the information Scarbrough provides about ACC's billing practices, establish that ACC billed Medicare for IMRT services performed using its software only verification process. Whether Scarbrough has adequately alleged that these claims were false is an issue that the court will address later in this opinion. But Scarbrough has satisfied Rule 9(b)'s requirements to plead with particularity that these claims were in fact submitted to Medicare.

2. *Sanford:* Scarbrough has also adequately alleged that Sanford submitted claims for IMRT services using the new software only verification process. Again, Scarbrough has alleged with particularity facts that establish that since 2016 all ACC clinics have used this process. Plus, Medicare billing data shows that from 2016 to 2020 Sanford submitted claims to Medicare for IMRT services. For example, in 2020, Sanford billed Medicare for 80 claims under Code 77301 at an average submitted charge of $2,500 each. (*Id.*, ¶ 147). And Medicare paid ACC an average of $1,416.84 for each of these claims. (*Id.*). These allegations state with particularity why Scarbrough believes Sanford billed Medicare for IMRT services using ACC's new software only verification process.

3. *Sengar:* Scarbrough, however, does not adequately allege that Sengar submitted or caused to be submitted false claims for reimbursement for IMRT services. Scarbrough contends that Sengar caused false claims to be submitted by not taking any steps to prevent the submission of claims for IMRT services after Scarbrough informed him that ACC's procedures were deficient. Fraudulent omissions, like fraudulent conduct, must be pleaded with particularity. *See Clausen*, 290 F.3d at 1310. And "a defendant's conduct may be found to have caused the submission of a claim for Medicare reimbursement" only "if the conduct was (1) a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1107 (11th Cir. 2020).

The complaint includes only two allegations related to Sengar's involvement with ACC's IMRT services: Sengar was copied on an email that informed ACC that its QA process was deficient, and Mills, Sanford, and Sengar knowingly removed patient specific IMRT QA procedures at all ACC facilities in January 2016. (Doc. 1, ¶¶ 135, 142). These allegations fall short of Rule 9(b)'s heightened requirement for pleading a fraudulent omission. The allegation that Sengar knowingly removed patient specific IMRT QA procedures is conclusory and contradicted by an earlier, particularized allegation that Sanford and Mills alone changed the QA process (*id.*, ¶ 129). Plus, the complaint doesn't allege what steps Sengar should have taken but didn't take once he received Scarbrough's email. Nor does the complaint explain how Sengar's failure to take these steps foreseeably induced the other ACC providers to submit false claims to Medicare. So Scarbrough hasn't pleaded with particularity how Sengar caused others to submit false claims for IMRT services to Medicare.

—

To sum up, Scarbrough has pleaded with particularity that ACC and Sanford submitted claims to Medicare for Radiation Treatment Management and IMRT services. Scarbrough has also pleaded with particularity that ACC submitted claims for Image Guided Radiation Therapy. But Scarbrough has not pleaded with particularity that Sengar submitted or caused to be submitted false claims for Radiation Treatment Management or IMRT services.

## II.    Scheme-specific arguments (Counts 1-4)

Having dealt with Defendants' overarching argument about claim submission, the court now tackles Defendants' scheme-specific arguments.

### A. IMRT-specific arguments

Defendants make two more arguments for why the court should dismiss Scarbrough's claims that they submitted false claims for IMRT services: (a) the complaint doesn't include facts about IMRT services after April 2017, and (b) Scarbrough hasn't adequately alleged that the claims for IMRT services were false or that ACC and Sanford knew of their falsity.

### 1. IMRT After April 2017

Defendants first argue that they cannot be held liable for claims for IMRT services submitted after April 2017 because that is when Scarbrough emailed Mills about ACC's QA procedures and the complaint doesn't include any specific allegations about ACC's IMRT services after that point. The court disagrees. Scarbrough says that he worked at ACC from 2017 to 2022. (*Id.*, ¶ 9). Through this experience, he learned that ACC removed patient specific QA procedures at all ACC facilities in January 2016. (*Id.*, ¶¶ 129, 142). They instead changed their procedures at all clinics to a software only verification system. (*Id.*, ¶¶ 129–41). These allegations adequately allege that from January 2016 onward—which, of course, includes many days after April 2017—all ACC facilities used the software only verification procedure that Scarbrough contends is deficient.

### 2. Falsity/Knowledge of Falsity

Scarbrough says each of ACC's claims for IMRT services after January 2016 were false because Medicare doesn't reimburse providers for services that aren't "reasonable and necessary for the diagnosis or treatment of illness or injury." *See* 42 U.S.C. § 1395y(a)(1)(A). A service is "reasonable and necessary" if "the service has been proven safe based on authoritative evidence . . . or . . . is generally accepted in the medical community as safe and effective for the condition for which it is used." 54 Fed. Reg. 4302, 4304 (Jan. 30, 1989). Thus, to show that Defendants submitted false claims for IMRT services, Scarbrough must plausibly allege that it was false to certify that ACC's QA testing procedures were generally accepted in the medical community as safe and effective. *See* 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B). He must also plausibly allege that ACC and Sanford knew of the falsity. *See id.*

The parties dispute whether ACC's software verification QA process satisfied the requirement that it perform patient specific end-to-end testing using a phantom, or other equivalent testing procedures. Establishing falsity requires pointing to an objective falsity that is "something more than the mere difference of reasonable opinion" among physicians. *See United States v. AseraCare, Inc.*, 938 F.3d 1278, 1296–97 (11th Cir. 2019). But if the interpretation of a Medicare requirement is "subject to multiple

interpretations . . . yet ultimately only one of the two possible interpretations could be deemed correct," the incorrect interpretation would be objectively false. *See id.* at 1299. A relator can establish the correctness of his interpretation by, for example, pointing to provisions from Medicare Carrier's Manual, Medicare bulletins, seminar programs, and expert testimony. *See Walker*, 433 F.3d at 1356–57. And a relator would plausibly allege that the defendant's services weren't reasonable and necessary if he were to identify industry and hospital guidelines that the defendant violated or objections to the defendant's practices by other physicians. *See Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 743 (10th Cir. 2018).

Scarbrough alleges that performing IMRT without "patient specific end-to-end testing QA using a phantom or other equivalent testing procedures, is not generally accepted in the medical community as safe and effective" and that ACC's practice is "wholly deficient from the required patient specific QA process that is accepted in the radiation oncology community." (Doc. 1., ¶¶ 124, 133). These allegations, standing alone, do not plausibly allege that ACC's IMRT services were not reasonable or necessary because they are merely "a formulaic recitation of the elements of [the] cause of action." *Iqbal*, 556 U.S. at 678. And though Scarbrough explains his interpretation of the QA requirements and plausibly alleges that ***he believes*** that ACC's procedures aren't safe and effective, he does not plausibly allege that the medical community agrees with his interpretation. Other than his own interpretation of what patient specific QA requires, Scarbrough cites only Local Coverage Determination L36711 to support his allegations that ACC's procedures fail this requirement. This local coverage determination mandates that "medical record documentation maintained by the provider must indicate the medical necessity for IMRT . . . and must include: Documentation of fluence distribution recomputed in a phantom, or equivalent methodology consistent with patient specific IMRT treatment verification." (Doc. 1., ¶ 125 (footnotes omitted)).

The local coverage determination does not distinguish between software or physical phantoms or explain which methodologies are consistent with patient specific IMRT treatment verification. And Scarbrough is the only source for his own contention that ACC's procedures don't satisfy these requirements. While Scarbrough is part of the medical community, his views

alone fail to establish that it is not generally accepted in the medical community as safe and effective for ACC to perform its "verifications on a standard phantom within the software Redcalc." (*Id.*, ¶ 137(cleaned up)). Thus, Scarbrough has not adequately alleged that the claims ACC and Sanford submitted to Medicare for IMRT services were false. And because Scarbrough hasn't shown that these claims were false, the court needn't address Defendants' argument that Scarbrough cannot show that they knew the claims were false.

### B. Radiation Therapy Management-specific arguments

Defendants say Scarbrough's claims that Sanford submitted false claims for radiation therapy management fail to satisfy Rule 9(b)'s particularity requirement because they are based on rumors. Defendants then say that the complaint doesn't include any radiation therapy management allegations for any time periods other than March 2018.[3]

#### 1. Rumors

A relator cannot "base[ ] his knowledge on rumors or mere conjecture." *Mastej*, 591 F. App'x at 708. But Scarbrough's radiation therapy management claims are based on neither. As explained, Scarbrough has given specific reasons for why he believes Sanford submitted false claims for radiation therapy management treatment services and provided the sources of his information. For example, ACC Director Baker admitted to Scarbrough that Sanford "never see his patients" and that this has always been his practice. (Doc. 1, ¶ 56). Plus, a Tuscaloosa employee confirmed in an email that Sanford "does not actually see the patient in the room every five fractions." (*Id.*, ¶ 54). And the lead administrative employee at the Tuscaloosa clinic instructed the lead therapist and others to disregard Baker's instructions of compliant billing of Code 77427 because "she was their boss and they should do as they were told." (*Id.*, ¶ 59). Finally, despite the evidence that Sanford never performed the required face-to-face encounters, Medicare billing data establishes that Sanford submitted hundreds of claims for reimbursement under CPT Code

---

[3] Defendants also say Scarbrough's allegations about their billing practices aren't enough to establish that they presented false claims to Medicare. As explained above, these allegations, combined with Scarbrough's other allegations, show that false claims were submitted.

77427. (*Id.*, ¶¶ 60–65).

These allegations are sufficiently particular because they establish exactly how Scarbrough contends Defendants violated the False Claims Act, the sources of Scarbrough's information, and why these sources knew whether Sanford performed the required face-to-face encounters. Thus, Scarbrough has stated a False Claims Act violation against Sanford and Alabama Cancer Care for submitting claims for radiation therapy management services under CPT Code 77427.

### 2. Time Periods Other Than March 2018

Defendants, however, say that Scarbrough's radiation therapy management claims should be limited to the March 2018 period because that is when Scarbrough had his conversation with Baker about Sanford's billing practices. The court disagrees. Again, Scarbrough learned in March 2018 that Sanford ***never*** sees his patients and that this ***has always been*** his practice. So Scarbrough has adequately alleged that the claims Sanford submitted from 2016 to March 2018 were false.

As for claims submitted after March 2018, Scarbrough has alleged that Tuscaloosa ACC employees were told to ignore Baker's instructions on when to bill for Code 77427 and to instead continue to bill for Code 77427 despite Sanford's lack of face-to-face visits. Viewing these allegations in a light most favorable to Scarbrough, ACC and Sanford never stopped their practice of billing Medicare for false claims for radiation therapy management. So the court will not limit Scarbrough's radiation therapy management claims to a more specific period than the 2016 to 2020 period that Scarbrough describes in his complaint.

### C. Image Guided Radiation Therapy-specific arguments

ACC asserts that Scarbrough has failed to plead with particularity the fraudulent scheme underlying his claims that ACC submitted false claims for image guided radiation therapy and made false records or statements material to these false claims. As explained, Scarbrough has direct, personal knowledge that he did not review CT images as required to bill for CPT Code 77014 and did not adjust his patients' radiation treatment according to the results of the

CT images. Yet Medicare billing data shows that from 2018 to 2020 hundreds of claims under CPT Code 77014 were billed to Medicare using Scarbrough's NPI number. And Scarbrough has alleged with particularity how ACC radiation technicians made false records material to these false claims by signing Scarbrough's name to CT scans he hadn't reviewed. As a result, Scarbrough's claims related to submitting claims for image guided radiation therapy services satisfy Rule 9(b)'s particularity requirement *See Walker*, 433 F.3d at 1360.

### III.    Reverse False Claim (Count 5)

Up to now, the court has dealt with Scarbrough's allegations that Defendants affirmatively submitted false claims to the Government. Count 5 alleges a *reverse* false claim violation against ACC, Sanford, and Sengar. To succeed in a reverse false claim action, a relator must show that the defendant either (i) knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or (ii) knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government. *See* 31 U.S.C. § 3729(a)(1)(G).

Defendants make three arguments for why the court should dismiss Scarbrough's reverse false claims count: (1) each of Scarbrough's affirmative false claims and false statement claims fail; (2) the reverse false claims count is duplicative of Scarbrough's other claims; and (3) Scarbrough hasn't identified an obligation Defendants owed the government at the time of their alleged false claims. The court has already rejected Defendants' first argument. The court addresses Defendants' other two arguments below.

1. *Obligation:* Congress defines obligation to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from retention of any overpayment." 31 U.S.C. § 3729(b)(3). "[I]n order for the concealment of an obligation to be actionable under the reverse false claims provision, the obligation must arise independent of the affirmative false claims that are actionable under the other FCA provisions." *United States ex rel. Culpepper v.*

*Birmingham Jefferson Cnty. Transit Auth.*, 584 F. Supp. 3d 1050, 1072 (N.D. Ala. 2022).

Scarbrough says Defendants violated the reverse false claims provision because they "knowingly submitted false claims to the United States and received funds based on false claims in violation of the FCA, yet . . . took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States." (Doc. 1, ¶ 172). A plain reading of this allegation is that Defendants' obligation to repay the government arises from their alleged submission of false claims and is thus duplicative of Scarbrough's other claims.

But Scarbrough says Defendants had an independent legal duty to report and return these overpayments to the government. As Scarbrough points out, Medicare overpayments are defined as "any funds that a person receives or retains . . . to which the person . . . is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B). And an overpayment must be reported and refunded to the government within "60 days after the date on which the overpayment was identified or the date any corresponding cost report is due, if applicable." 42 U.S.C. § 1320a-7k(d)(2)(A)-(B). "Any overpayment retained by a person after the deadline for reporting and returning the overpayment . . . is an obligation" as defined in the False Claims Act. 42 U.S.C. § 1320a-7k(d)(3).

At this point, the court needn't decide whether Defendants' statutory obligation to reimburse Medicare for overpayments prevents Scarbrough's reverse false claims count from being duplicative of his other claims. "[A]ny [False Claims Act] claim, including a reverse false claim, must meet the heightened pleading requirements under Rule 9(b)." *Taul v. Nagel Enters., Inc.*, 2017 WL 432460, at *11 (N.D. Ala. Feb. 1, 2017). And Scarbrough does not allege with particularity his basis for contending that Defendants violated the reverse false claims provision. For example, the complaint points out that the retention of overpayments for more than 60 days is an obligation under the False Claims Act. (Doc. 1, ¶ 15). But Scarbrough doesn't tie that allegation to his reverse false claim count or clearly identify this obligation as the one he contends that Defendants avoided. Nor does Scarbrough allege with particularity what Defendants did once Medicare reimbursed them for the alleged false claims. Scarbrough's only factual allegation related to retaining

these funds is that Dr. Sengar "refused to refund Medicare for thousands of false [radiation treatment management] billings." (*Id.*, ¶ 57). This bare allegation fails to provide "some indicia of reliability" that Defendants retained the alleged overpayments past the 60-day deadline. *See Clausen*, 290 F.3d at 1311. So Scarbrough hasn't adequately pleaded that Defendants knowingly avoided an obligation to pay the government.

2. *False record or statement:* Under the false statement prong of the reverse false claim provision, a relator must show "that the defendants owed an obligation to pay money to the United States at the time of the allegedly false statements." *Matheny*, 671 F.3d at 1223.

Scarbrough says that the false statements that support his reverse false claims count are the CMS Form 1500s that Defendants submitted to claim reimbursement for the radiation therapy management, image guided radiation therapy, and IMRT services. But these statements were made before Medicare paid any associated claims. So at the time Defendants made these statements, there was no overpayment that Defendants had an obligation to repay.

—

For both these reasons, Scarbrough has failed to state a claim under either prong of the reverse false claim provision of the False Claims Act.

## IV.   Leave to Amend

As explained, some of Scarbrough's claims are sufficiently pleaded and some are not. Sanford says the court should dismiss with prejudice the deficiently pleaded claims.

Under Rule 15(a), this court should "freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). So absent "undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment" this court should grant leave to amend. *See Perez v. Wells Fargo, N.A.*, 774 F.3d 1329, 1340 (11th Cir. 2014) (cleaned up).

This is Scarbrough's first complaint, and the court finds that Scarbrough may be able to cure the pleading deficiencies that the court has identified. So the court will give Scarbrough another chance to plead his claims against Dr. Sengar, the IMRT services related claims, and the reverse false claims count. Scarbrough has until **March 6, 2025,** to file an amended complaint. Failure to replead these claims by this deadline will lead to the court dismissing them with prejudice.

## CONCLUSION

For these reasons, the court will **GRANT IN PART** and **DENY IN PART** Defendants' motions to dismiss (docs. 21 & 22). The court will **DISMISS WITHOUT PREJUDICE** Scarbrough's claims against Sengar, the IMRT services claims against each Defendant, and the reverse false claims count. The court denies Defendants' motions to dismiss all other claims.

Scarbrough has until **March 6, 2025,** to file an amended complaint that cures the pleading deficiencies noted above. Failure to file an amended complaint by this deadline will lead to the court dismissing with prejudice the claims that it has dismissed without prejudice.

The court will enter a separate order that carries out this ruling.

**Done** on February 13, 2025.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE