FILED

2026 Jan-27  PM 01:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

**UNITED STATES OF AMERICA**
*ex rel.* **DR. TODD SCARBROUGH,**
    Plaintiff,

**v.**

**ALABAMA CANCER CARE, LLC,**
*et al.*,
    Defendants.

**Case No. 1:22-cv-1533-CLM**

## MEMORANDUM OPINION

On behalf of himself and the United States, Dr. Todd Scarbrough sues his former employer, Alabama Cancer Care, LLC, as well as Dr. Shelby Sanford and Dr. Ashvini Sengar, asserting that they knowingly defrauded the United States by billing Medicare for radiation oncology services that were never performed or medically unnecessary. The court dismissed some of the claims in Scarbrough's original complaint without prejudice to give Scarbrough the opportunity to correct any deficiencies (docs. 34, 35). Scarbrough has since amended his complaint (doc. 41), and Defendants move to dismiss the amended complaint (doc. 44). The court rules on Defendants' motion here.

This opinion should be read as a continuation of the court's opinion about the original complaint (doc. 34), which the court calls "Part I" from now on. For the reasons stated below, Part II ends with the same result: The court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss (doc. 44).

## BACKGROUND

Scarbrough bases his amended complaint on the same essential facts as his original complaint, so the court needn't repeat all Scarbrough's allegations here. The court instead limits its recitation of the facts to (a) allegations Scarbough added in his amended complaint, and (b) allegations relevant to Defendants' motion to dismiss that weren't the focus of Part I of this opinion.

Scarbrough's amended complaint asserts that Alabama Cancer Care ("ACC") participated in three schemes to defraud Medicare:

- Billing for radiation treatment management under CPT Code 77427 that was never provided.

- Billing for computed tomography (CT) diagnostic services that were never reviewed by a physician as required by Medicare conditions of payment and forging and falsifying documentation to substantiate billing for such services.

- Billing for IMRT services, performed using equipment that was unsafe and not properly verified as safe and effective under Medicare's requirements.

(Doc. 41, ¶ 9, 41).

## A.    Claims for Radiation Treatment Management (Code 77427)

Scarbrough first says ACC improperly billed Medicare for radiation treatment management under CPT Code 77427, which Scarbough says requires a radiation oncologist to personally visit the patient once every five fractions. (*Id.*, ¶¶ 46–48). As discussed in Part I, Scarbrough asserts that Dr. Sanford submitted false claims under CPT Code 77427 because Sanford "never sees the patients," which "has always been [Sanford's] practice." (*See id.*, ¶ 56).

1. *Sengar*: Scarbrough contends that Dr. Sengar falsely billed Medicare under CPT Code 77427 for two reasons. First, Scarbrough asserts that he learned from ACC's Anniston office medical assistant Shelby Brodeur that Sengar instructed Anniston billing employees to bill Medicare under Code 77427 even though Sengar did not see patients as required to bill under that code. (*Id.*, ¶ 67). Second, Scarbrough says Sengar billing for radiation treatment management services is facially fraudulent because Sengar is not a radiation oncologist. (*Id.*, ¶ 68). To support this assertion, Scarbrough points out that while Sengar is board certified by the American Board of Internal Medicine, he is not board certified by the American Board of Radiology in radiation oncology. (*See id.*, ¶ 72). Scarbrough also notes that after graduating from medical school, Sengar did an internal medicine residency for three years followed by a three-year medical oncology fellowship. (*Id.*, ¶ 71).

2. *Sehbai*: Scarbrough's final radiation treatment management-related allegations are that ACC submitted false claims under Code 77427 on behalf of Dr. Aasim Sehbai. According to Scarbrough, Sehbai, like Sengar, instructed Anniston billing employees to bill Medicare under Code 77427 even though he did not see patients as required to bill under that code. (*Id.*, ¶ 67).

## B.    Claims for CT Diagnostic Services (Code 77014)

CPT Code 77014 corresponds with review of radiation oncology CT scans and is called "CT Guidance for placement of radiation therapy fields." (*Id.*, ¶ 93). As explained in Part I, Scarbrough alleges that ACC routinely improperly accessed his electronic medical records ("EMR") account and NPI number to bill for thousands of services under CPT Code 77014 as though Scarbrough personally performed the services—which he didn't. (*Id.*, ¶ 109). Scarbrough also says that he learned that the ACC employees who fraudulently signed treatment records under his name never signed the images or records before the next fraction. (*See id.*, ¶ 113). Thus, Scarbrough contends that claims for these CT scan diagnostic images were fraudulent for two reasons. First, the diagnostic images weren't reviewed by a physician. (*Id.*, ¶ 114). Second, the images were medically unnecessary because they weren't reviewed by anyone until **after** the radiation treatment that was purportedly informed by the CT image was already performed. (*Id.*).

Scarbrough also asserts that he wasn't the only doctor whose NPI number was improperly used to submit claims under Code 77014. For example, Scarbrough alleges that ACC also used Dr. Anna Harris's NPI number to submit false claims under Code 77014. (*Id.*, ¶ 122). Scarbrough has reviewed medical records of CT images purportedly signed by Harris and recognized that the images weren't in fact reviewed by Harris and were signed weeks or months after the image and radiation therapy supposedly based on that image was completed. (*See id.*). J.W. is one Medicare patient whose medical records Scarbrough reviewed. (*Id.*, ¶ 123). J.W. received two IGRT treatments per day, five days a week from May 17, 2022, to May 31, 2022. (*Id.*). Before each of these treatments, J.W. received a CBCT image that should have been performed to accurately position the radiation to J.W.'s cancerous tissue. (*Id.*). Each of these CBCT images were then billed to Medicare under Harris's NPI number (*Id.*).

Scarbough, however, asserts that Harris had no idea that ACC was billing Medicare for these CBCT images and did not sign the image as required to bill for this service. (*Id.*). Instead, one of the radiation technicians in the Anniston Office signed these images under Harris's name within ACC's EMR system. (*Id.*). Plus, the forged signatures on J.W.'s CBCT images weren't executed until weeks after the service was performed. (*Id.*). For example, the CBCT image performed on May 17, 2022, was not signed until May 31, 2022, rendering any review or adjustment of radiation based on this image meaningless and medically unnecessary. (*Id.*).

### C.    Claims for IMRT (Codes 77301, 77338, G6015, G6016)

1. *IMRT requirements*: Scarbrough finally alleges that ACC does not perform the reasonable and necessary quality assurance required for intensity modulated radiation ("IMRT") services. IMRT is a highly specialized form of radiation therapy that involves a computer-based method of planning for, and delivery of, narrow patient specific modulated beams of radiation to solid tumors within a patient. (*Id.*, ¶ 125). With IMRT, exacting Quality Assurance ("QA") is necessary to achieve the preferred radiation dose distribution with accuracy and reproducibility. (*Id.*, ¶ 130). Thus, patient specific QA is expected to be performed to receive Medicare reimbursement for IMRT services. (*Id.*).

A critical component to the required patient specific QA process is "Dose Delivery Verification." (*Id.*, ¶ 139). For this process, a qualified medical physicist should ensure verification of the radiation doses being received during treatment. (*Id.*). Before the start of each patient's course of treatment, accuracy of dose delivery should be documented delivering a test dose of radiation to a phantom. (*Id.*). A phantom is a mass of material used to mimic human tissue and contains a calibrated dosimetry system to verify that the dose delivered is the dose planned. (*Id.*, ¶ 140). So the required patient specific QA for IMRT typically involves performing the planned radiation dose delivery for each patient before beginning the course of treatment. (*Id.*, ¶ 141). This testing procedure is called "patient-specific end-to-end testing," and either this test or an alternative test that provides equivalent verification is required for safe and effective IMRT delivery. (*Id.*, ¶¶ 141–42).

Medicare pays only for services that are generally accepted in the medical community as safe and effective. (*Id.*, ¶ 26). And Scarbrough says that performing IMRT without performing patient specific end-to-end testing QA using a phantom or equivalent is not generally accepted in the medical community as safe and effective. (*Id.*, ¶ 144). For example, the American College of Radiology and American Society for Radiation Oncology note that patient-specific QA is an industry standard for IMRT services:

> ***Patient-specific QA must be performed before clinical treatment begins***. Further, QA procedures are then continued through the IMRT treatment process. ***Such patient-specific treatment verification is linked to implementation; it may be considered the confirmatory phase of the IMRT treatment process, assuring compliance with the aforementioned sections for the individual patient***. Through a process that starts before the initiation of treatment and then continues throughout the course of treatment, verification data confirm the correctness of the administered dose using transfer of both the technical setup and the dose delivery data. The radiation oncologist must remain available to adjust, modify, and revise any aspects of the initial plan as the clinical situation warrants. . . The medical physicist should assure verification of actual radiation doses being received during treatment delivery. Before the start of treatment and using all of the parameters of the patient's treatment plan, ***the accuracy of dose delivery should be documented by irradiating a phantom containing a calibrated dosimetry system to verify that the dose delivered is the dose planned***. Multiple points in the delivered distribution should be compared against the planned distribution, as can be accomplished, for example, using film dosimetry with the phantom. ***This testing procedure has been termed "patient-specific end-to-end testing.***"

(*Id.*, ¶ 145 (emphasis in original)).

And in December 2023, Medicare established Local Coverage Determination ("LCD") L39553. (*Id.*, ¶ 146). According to Scarbrough, this LCD adopted the decades old industry standards on patient-specific QA:

> The physicist or supervised dosimetrist will calculate a multiple static beam and/or modulated arc treatment plan to deliver the prescribed radiation doses to the PTV and also meet OAR dose constraints. Dose volume histograms must be prepared for the PTV and OARs. Continuously moving MLCs are used to deliver the optimized modulated radiation doses to the tumor and nearby organs with that patient. ***The distinguishing feature of <u>an IMRT plan</u> is that it demonstrates how treatment with non-uniform beam intensities will be delivered***. Basic dose calculations are done on each of the modulated beams or arcs in order to verify the computerized calculations. ***The <u>calculated beams or arcs are delivered to a phantom or a dosimetry measuring device</u> to confirm the intended dose will be accurate and that delivery will be technically feasible.***

(*Id.*, ¶¶ 146–47(emphasis in original and footnotes omitted)).

Scarbrough says that under these industry recognized standards Medicare has conditioned payment for IMRT services on providers performing verification of radiation therapy in either a phantom or through a dosimetry measuring device to confirm that the intended dose will be accurate and that delivery will be technically feasible. (*Id.*, ¶ 148).

2. *ACC's procedures*: Scarbrough alleges that in January 2016 all ACC clinics changed their QA verification process to remove required patient specific QA procedures. (*Id.*, ¶ 152). Sanford and Keith Mills, ACC's physicist, made this decision to cut costs and increase revenue. (*Id.*, ¶ 152–53). This new QA process does not involve verifying the radiation delivery machines via phantoms or a calibrated dosimetry measuring device. (*Id.*, ¶ 155). Instead, RadCalc software uses a virtual phantom and only checks the physical measurements of the radiation machine quarterly. (*Id.*, ¶ 156).

Scarbrough says that ACC's use of a virtual phantom is deficient because this generic phantom is not based on any specific patient or patient's custom designed treatment plan. (*Id.*, ¶ 159). Thus, Scarbrough asserts that the RadCalc software does not (1) verify that the calculated beams or arcs are delivered to a phantom or dosimetry measuring device, or (2) confirm that the intended dose will be accurate and feasible in accordance with the patient's specific treatment plan. (*Id.*, ¶ 158).

In April 2017, Scarbrough questioned Mills about the lack of patient-specific IMRT QA procedures. (*Id.*, ¶ 165). Scarbrough copied Sanford and Sengar on this email exchange and informed them that ACC's QA process was deficient and in violation of Medicare Conditions of Payment. (*Id.*). In response, Mills acknowledged that ACC's current procedures did not assess the physical characteristics of the radiation machine or the specific patient set-up and positioning. (*Id.*, ¶ 167). Instead, Mills stated that he performs verifications on a standard phantom within the software RadCalc. (*Id.*). Scarbrough says that there are at least three problems with this response. First, a standard phantom is not equivalent to the patient specific requirements because not all patients are the same and patients receive radiation therapy for different organs that impact different organ systems. (*Id.*, ¶ 168). Second, RadCalc does not use a calibrated dosimetry measuring device, so it does not perform dose verification using a physical phantom or calibrated dosimetry measuring device per established industry standards. (*Id.*, ¶ 169). Finally, performing only software verifications is not equivalent to true patient specific phantom QA because the software cannot verify that the machine is functioning properly and that the specific patient is set up and stabilized to properly receive safe and effective radiation treatment. (*Id.*, ¶ 170).

Because ACC removed patient specific IMRT QA procedures at all ACC facilities in January 2016, Scarbrough says that each ACC claim submitted after January 2016 for CPT Codes 77301, 77338, G6015, and G6016 (*i.e.*, the IMRT CPT Codes) was false. (*Id.*, ¶ 174).

### D.    The Complaint

Scarbrough's amended complaint pleads four counts against ACC, Sanford, and Sengar. Count 1 alleges that ACC violated 31 U.S.C. § 3729(a)(1)(A) by presenting or causing to be presented false claims for each of the three alleged schemes. (*Id.*, ¶¶ 195–99). Count 2 alleges that Sanford violated 31 U.S.C. § 3729(a)(1)(A) by submitting or causing to be submitted false claims for radiation treatment management services under CPT Code 77427 and IMRT services under CPT Codes 77301, G6015, and G6016. (*Id.*, ¶ 200–204). Count 3 asserts that Sengar knowingly submitted or caused to be submitted false claims for radiation treatment management services under CPT Code 77427 and IMRT services under CPT Codes 77301, 77338, G6015, and G6016. (*Id.*, ¶¶ 205–209). But Scarbrough's response to Defendants' motion to dismiss clarifies that "the Amended Complaint does not seek to prosecute FCA IMRT claims against Dr. Sengar." (Doc. 46, p. 29). Finally, Count 4 alleges that ACC, Sanford, and Sengar made or used false statements or records material to their false claims in violation of 31 U.S.C. § 3729(a)(1)(B). (Doc. 41, ¶¶ 210–14).

## STANDARDS OF REVIEW

Rule 12(b)(6) allows the court to dismiss a complaint if it fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In a False Claims Act action, the court must judge the sufficiency of the complaint under the pleading requirements of both Rule 8 and Rule 9(b). *See Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015).

1. *Rule 8(a)*: Rule 8's general pleading requirement is that the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a). Rule 8 does not require "detailed factual allegations," but does demand more than "an unadorned, the-defendant-unlawfully-harmed me accusation." *Iqbal*, 556 U.S. at 678 (quotations omitted). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Id.*

2. *Rule 9(b)*: Under Rule 9(b)'s heightened requirements for pleading fraud, a plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this heightened-pleading standard in a False Claims Act action, the relator has to allege facts as to time, place, and substance of the defendant's alleged fraud, particularly the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Urquilla-Diaz*, 780 F.3d at 1051 (quotations omitted).

## DISCUSSION

In ruling on Defendants' motion to dismiss, the court will address each of the three alleged schemes in turn.

## I. Claims for Radiation Treatment Management (Code 77427)

In Part I, the court denied Defendants' motions to dismiss the claims against Sanford and ACC related to the submission of false claims for radiation treatment management services that Sanford allegedly provided. The court granted Sengar and ACC's motion to dismiss the radiation treatment management allegations related to Sengar. Scarbrough's amended complaint repleads the radiation treatment management allegations included in his original complaint. Scarbrough adds that any claims for radiation treatment management submitted by Sengar are false because Sengar is not a radiation oncologist.

Defendants argue that none of Scarbrough's radiation treatment management allegations satisfy Rule 9(b)'s heightened pleading requirements. They also say that Scarbrough's new allegations related to Sengar fail because they (a) are precluded by the public disclosure bar, and (b) do not establish materiality.

### A. Dr. Sanford

"[S]ome indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made by the Government." *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002). This court evaluates "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006).

The court stands by its determination in Part I that Scarbrough's allegations provide a sufficient indicia of reliability that Dr. Sanford submitted false claims to Medicare for radiation treatment management services. Scarbrough has alleged with particularity the bases for his belief that (a) to bill under Code 77427, a radiation oncologist must personally visit with the patient every five fractions, and (b) Sanford doesn't see his patients every five fractions. Plus, Scarbrough has shown that Medicare billing data establishes that Sanford billed Medicare for hundreds of claims under Code 77427 from 2016 to 2020.

The court rejects Sanford's argument that Scarbrough cannot connect this Medicare billing data to Sanford's allegedly fraudulent conduct because Sanford practices at both ACC's Tuscaloosa and Winfield locations. True, the court found in Part I that Scarbrough hadn't adequately alleged that Sengar submitted a false claim to Medicare for radiation treatment management because Scarbrough's knowledge of Sengar's allegedly fraudulent conduct was limited to ACC's Anniston office. And most of Scarbrough's allegations about Sanford relate to Sanford's practice at ACC's Tuscaloosa office. But Scarbrough also alleged that he learned from ACC Director Kevin Baker that Sanford "never sees his patients" and this "has always been his practice." (Doc. 41, ¶ 56). While Baker's knowledge of Sanford's failure to see patients was based on discussions with Tuscaloosa radiation therapists, Baker did not qualify his statement by saying that it applied only to Sanford's conduct at the Tuscaloosa office. (*See id.*). "At the motion-to-dismiss stage," this court takes "the plaintiff's well-pleaded allegations as true. That does not change in FCA cases." *Vargas v. Lincare, Inc.*, 134 F.4th 1150, 1159 (11th Cir. 2025) (citations omitted). Accepting as true Scarbrough's well-pleaded factual allegations, Sanford *never* saw his patients at either ACC's Tuscaloosa or Winfield offices yet told the Government that he met his patients face-to-face by submitting hundreds of claims under Code 77427. Because these facts could prove a viable claim, the court **DENIES** Sanford's motion to dismiss the radiation treatment management claims brought against him.

### B.    Dr. Sengar

Scarbrough says that Dr. Sengar also submitted false claims under Code 77427 because (a) Sengar also doesn't see his patients every five fractions, and (b) he is not a radiation oncologist.

1. *Face-to-face encounter allegations*: In Part I, the court dismissed Scarbrough's radiation treatment management claims against Sengar because Scarbrough's knowledge of Sengar's failure to perform face-to-face encounters was limited to times when Scarbrough was absent from ACC's Anniston office. As the court explained, Sengar practices in ACC's Anniston, Gadsden, and Ft. Payne offices. Thus, it was possible that each of the Code 77427 claims from Sengar on CMS's website weren't for the radiation treatment management services that Scarbrough's complaint described. Scarbrough's amended complaint doesn't fix this pleading deficiency. Instead, Scarbrough asserts that Sengar's submission of claims under Code 77427 at any of ACC's offices was fraudulent because Sengar is not a radiation oncologist. Thus, to the extent that Scarbrough is still bringing a radiation treatment management claim against Sengar based on Sengar's failure to have face-to-face encounters with his patients every five fractions, the court **GRANTS** Sengar's motion to dismiss those claims for failure to satisfy Rule 9(b)'s requirements.

2. *Radiation oncologist allegations*: As for Scarbrough's allegations that Sengar's claims under Code 77427 were false because Sengar is not a radiation oncologist, the court agrees with Sengar that these allegations are subject to dismissal under the False Claims Act's public disclosure bar. So the court needn't address Sengar's alternative argument that Scarbrough has failed to plausibly allege materiality.

The False Claims Act's public disclosure bar states:

> (A) The court shall dismiss an action or claim . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4).

The Eleventh Circuit uses a three-part to determine whether public disclosures require dismissal of a qui tam lawsuit: (1) whether the "allegations made by the plaintiff [have] been publicly disclosed"; (2) if so, whether the disclosed information is substantially the same as the allegations in the plaintiff's lawsuit; and (3) if so, whether the plaintiff is "an 'original source' of that information." *See United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir. 2015).

A. <u>Public disclosure</u>: The first prong of this three-part test asks, "whether the sources on which the defendants rely fall into the statute's enumerated categories of sources that are considered public." *See id.* Relevant here is whether Scarbrough's allegation that Sengar was not a radiation oncologist was publicly disclosed in the news media or a federal report.

Sengar relies on four sources to say that it was publicly disclosed that he was a medical oncologist, and not a radiation oncologist, billing for services under Code 77427. First, Sengar points out that ACC's website identifies him as a medical oncologist while it identifies other physicians, such as Sanford, as radiation oncologists. *See* https://www.alcancercare.com/our-providers (last visited Jan. 27, 2026). Second, the Alabama Board of Medical Examiners' website lists Sengar's specialty as oncology. https://dashboard.albme.gov/Verification/search.aspx (last visited Jan. 27, 2026). Third, an article from the *Selma-Times Journal* describes Sengar as the medical oncologist on staff at the Cancer Care Center of Selma while noting that the cancer care center's staff would also include a radiation oncologist and urologist. https://www.selmatimesjournal.com/news/cancer-care-center-of-selma-set-to-open-in-may-306993/ (last visited Jan. 27, 2026). Lastly, Sengar notes that the information

Scarbrough alleges about Sengar's submission of claims under Code 77427, such as how many claims Sengar submitted in any given year and Medicare's average payment for each claim, is publicly available on CMS's website.

Sengar also explains that the CMS website identifies his provider type as "Hematology-Oncology":



*See* https://data.cms.gov/tools/medicare-physician-other-practitioner-look-up-tool/provider/1376520254?size=10&offset=0&lastName=Sengar&firstName=Ashvini (last visited Jan. 27, 2026) (circle added).

But CMS describes Scarbrough and Sanford's specialties as "Radiation Oncology":



*See* https://data.cms.gov/tools/medicare-physician-other-practitioner-look-up-tool/provider/1194700625?size=10&offset=0&lastName=Scarbrough&firstName=Todd (last visited Jan. 27, 2026); https:// data.cms.gov/tools/medicare-physician-other-practitioner-look-up-tool/provider/1689681967? size=10& offset=0&lastName=Sanford&firstName=Shelby (last visited Jan. 27, 2026) (circle added).

The *Selma-Times Journal* article "clearly qualif[ies] as news media." *Osheroff*, 776 F.3d at 813. So does ACC's website about its physicians, clinics, and programs. *See id.* And the term "news media" has "a broad sweep," which includes "publicly available websites intended to disseminate information." *See United States ex rel. Jacobs v. JP Morgan Chase Bank, N.A.*, 113 F.4th 1294, 1301 (11th Cir. 2024) (cleaned up). Thus, the court finds that the Alabama

Board of Medical Examiners website also counts as news media under the False Claims Act. Finally, "data from the CMS database is a federal report." *See United States ex rel. Edler v. Escambia Cnty.*, 2023 WL 12195450, at *4 (N.D. Fla. Sept. 7, 2023). So the first requirement for public disclosure is met.

B. "Substantially the same": Because the court concludes that the information Sengar relies on was publicly disclosed, the court must next decide whether the allegations in Scarbrough's amended complaint are "substantially the same allegations or transactions" included in the public disclosures. *See* 31 U.S.C. § 3730(e)(4). "This part of the test is a quick trigger to get to the more exacting original source inquiry." *Jacobs*, 113 F.4th at 1302 (quotations omitted). As a result, "[s]ignificant overlap between [the plaintiff's] allegations and the public disclosure is sufficient to show that the disclosed information forms the basis of th[e] lawsuit and is substantially similar to the allegations in the complaint." *Id.*

Scarbrough's essential allegations related to Sengar's submission of claims under Code 77427 are that these claims were false because Sengar is a medical oncologist and not a radiation oncologist. These allegations are substantially the same as the transactions described in the public disclosures. By itself, CMS's website discloses that (a) Sengar submitted several claims to Medicare under Code 77427, and (b) Sengar's specialty is Hematology-Oncology. And while CMS, ACC's website, and the *Selma-Times Journal* all call Sengar a medical oncologist, they identify the specialty of physicians who are radiation oncologists as radiation oncology. Thus, you can infer from these publicly available sources that Sengar is not a radiation oncologist.

For two reasons, Scarbrough says these transactions aren't substantially similar to the allegations in his amended complaint. First, while the public disclosures consider Sengar a medical oncologist, they do not explicitly state that Sengar does not also have the training, expertise, and education to hold himself out as a radiation oncologist. Second, the public disclosures do not allege that Sengar engaged in fraud or wrongful conduct.

The public disclosure bar requires only "significant overlap" between the public disclosure and allegations in a relator's complaint. *See Jacobs*, 113 F.4th at 1302–03. It does not require "that a mirror image of the complaint's

allegations ha[ve] been publicly disclosed." *Id.* at 1303. And on their face, the transactions described in the CMS database publicly disclose that Sengar is a medical oncologist who has billed Medicare for claims under Code 77427. Thus, they needn't also explicitly state that Sengar didn't cross train as a radiologist to be substantially similar to the allegations in Scarbrough's complaint.

Plus, a public disclosure needn't "specifically allege False Claims Act fraud" to satisfy the public disclosure bar's "substantially the same" standard. *See id.* at 1302–03. All that's required is that the relator's "key allegations of fraudulent activity have significant overlap" with the public disclosures. *See id.* at 1302. And here, the public disclosures fully disclose that Sengar (a) billed Medicare for claims under Code 77427, and (b) unlike Sanford and Scarbrough, isn't considered a radiation oncologist. Thus, both Sengar's alleged misrepresentation (that he could bill Medicare for services under Code 77427) and the true set of facts that Scarbrough says shows that misrepresentation (that Sengar is a medical oncologist and not a radiation oncologist) were revealed in the public disclosures. That's enough to satisfy the second prong of the public disclosure inquiry. *See United States ex rel. Ondis v. City of Woodstock*, 587 F.3d 49, 54 (1st Cir. 2009).

C. <u>Original source</u>: Finally, the court decides whether Scarbrough is an "original source;" that is, a person who has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B). Scarbrough says that he is an original source because he gained this knowledge while working with Sengar at ACC:

> 75. . . . Dr. Sengar is not trained in radiation oncology, Dr. Sengar is not board certified in radiation oncology, he does not practice radiation oncology, and administering radiation has been and is outside the scope of his medical practice[.]
>
> 84. . . . [A]t no time during 2018, 2019, or 2020 was Dr. Sengar a Radiation Oncologist.
>
> 85. During 2018, 2019, and 2020, Dr. Sengar did not administer radiation.

(*See* Doc. 41, ¶¶ 75, 84, 85). These facts aren't enough. For example, Scarbrough hasn't explained how he learned that administering radiation was outside the scope of Sengar's practice. Plus, these are the facts Scarbrough pleads to support his conclusion that Sengar isn't a radiation oncologist:

> 70. Dr. Sengar graduated medical school from the King Georges Medical School in 1993.
>
> 71. After graduation, Dr. Sengar did an internal medicine residency for three years and, thereafter, Dr. Sengar did a three-year medical oncology fellowship.
>
> 72. Dr. Sengar is board certified by the American Board of Internal Medicine. He is not board certified . . . by the American Board of radiology in radiation oncology.
>
> 73. Since 1993, Dr. Sengar has been and is a Medical Oncologist.
>
> 74. Medical oncologists such as Dr. Sengar treat cancers with chemotherapy. In contrast, Radiation oncologists (such as Relator Dr. Scarbrough) use various forms of radiation to treat tumors.
>
> 75. ***Consequently***, Dr. Sengar is not trained in radiation oncology, Dr. Sengar is not board certified in radiation oncology, he does not practice radiation oncology, and administering radiation has been and is outside the scope of his medical practice[.]

(*Id.*, ¶¶ 70–75 (emphasis added)). As the court has confirmed, a quick Google search would give any member of the public the same information about Sengar's status as a medical oncologist. And Scarbrough doesn't dispute that his knowledge of Sengar's submission of claims under Code 77427 is based on the data from CMS's website. Thus, the court finds that Scarbrough's knowledge isn't independent of what's been publicly disclosed.

Nor does Scarbrough's knowledge materially add to the publicly disclosed allegations or transactions. The public disclosures about Sengar's status as a medical oncologist and his submission of claims under Code 77427 are "sufficient to give rise to an inference of fraud," so Scarbrough's "cumulative allegations do not materially add to the public disclosures." *See Jacobs*, 113 F.4th at 1303 (quotations omitted). And while Scarbrough's knowledge about the field of oncology provides background information, which lets him understand that the public disclosures reveal fraud, that's not enough to be an original source under the statute. *See id.* As a result, the court **GRANTS** Sengar's motion to dismiss the allegations that he submitted false claims to Medicare under Code 77427 because he is not a radiation oncologist.

### C.    ACC

In his amended complaint, Scarbrough alleges that ACC is liable for the submission of false claims under Code 77427 on behalf of Sanford, Sengar, and Sehbai. For the reasons discussed in Part I, the court finds that Scarbrough has adequately alleged that ACC submitted false claims for Sanford under Code 77427. So the court **DENIES** ACC's motion to dismiss the Sanford-related Code 77427 allegations brought against it. But the court **GRANTS** ACC's motion to dismiss the Sengar-related Code 77427 allegations. Scarbrough's allegations about Sengar's alleged lack of face-to-face patient encounters do not adequately allege the submission of a false claim under Rule 9(b)'s particularity requirements. And the public disclosure bar precludes Scarbrough's allegations that Sengar's status as a medical oncologist means he cannot bill under Code 77427.

As for Sehbai, Scarbrough's complaint establishes that Scarbrough's knowledge of Sehbai's failure to satisfy the face-to-face encounter requirement is limited to times when Scarbrough was absent from ACC's Anniston office. (*See* Doc. 41, ¶ 67). And it's *possible* that each of the Code 77427 claims for Sehbai on CMS's website are for services rendered by Sehbai at other times. Because submission of a false claim cannot "be inferred from the circumstances," *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005), Scarbrough hasn't adequately alleged that the CMS data includes false claims from Sehbai under Code 77427. The court thus **GRANTS** ACC's motion to dismiss the Sehbai-related Code 77427 allegations.

—

To sum up, the court **DENIES** Sanford and ACC's motion to dismiss the Sanford-related Code 77427 allegations. The court **GRANTS** Sengar and ACC's motion to dismiss the Sengar and Sehbai-related Code 77427 allegations. Because Scarbrough has had two chances to adequately plead his radiation treatment management allegations, the court's dismissal of the Sengar and Sehbai-related allegations will be **WITH PREJUDICE**.

## II.    Claims for Image Guided Radiation Therapy (Code 77014)

Scarbrough next says that ACC is responsible for the submission of false claims for image guided radiation therapy under Scarbrough and Harris's NPI numbers. ACC asks the court to dismiss the allegations related to both Scarbrough and Harris.

### A.    CT Images Under Scarbrough's NPI Number

Scarbrough asserts that to bill for CT imaging services under Code 77014 a physician must personally review, interpret, and consider the results of the CT scan before the patient's next fraction. (Doc. 41, ¶ 107). And while working at ACC Scarbrough did not review CT images like Code 77014 requires. (*Id.*, ¶ 110). Yet ACC radiation technicians used Scarbrough's NPI number to sign his patients' treatment records under Code 77014 and never signed these records before the patients' next fraction. (*Id.*, ¶¶ 112–13). Plus, Medicare billing data confirms that from 2018 to 2020 hundreds of claims under Code 77014 were submitted under Scarbrough's NPI number. (*Id.*, ¶¶ 118–20).

In Part I, the court explained that these allegations adequately alleged that ACC was responsible for the submission of false claims to Medicare. But ACC asserts that Scarbrough hasn't adequately alleged knowledge because he hasn't alleged that any other ACC employees knew that Scarbrough wasn't reviewing the CT images. The court disagrees. Under Rule 9(b) knowledge "may be alleged generally." Fed. R. Civ. P. 9(b). And Scarbrough has alleged that ACC submitted false claims under Code 77014 "with knowledge that the billing physician, including Relator Scarbrough, for whom it billed this service did not review and sign the CT images and therefore never actually provided the services required to bill CPT Code 77014." (Doc. 41, ¶ 196).

Plus, the False Claims Act's scienter requirement is satisfied when someone acts with either actual knowledge, deliberate ignorance, or reckless disregard. *See* 31 U.S.C. § 3729(b)(1). "[T]he term 'deliberate ignorance' encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statements truth or falsity." *United States ex rel. Schutte v. Supervalu Inc.*, 598 U.S. 739, 751 (2023). And "the term 'reckless disregard' similarly captures defendants who are conscious of a substantial and justifiable risk that their claims are false, but submit the claims anyway." *Id.* After reviewing Scarbrough's allegations, the court finds it plausible that ACC's employees were at least conscious of a substantial and justifiable risk that (a) Dr. Scarbrough hadn't reviewed the CT images being billed under Code 77014, and (b) no one had considered the images before the patients' next fraction. So the court will **DENY** ACC's motion to dismiss the Code 77014 allegations related to the billing for services under Dr. Scarbrough's NPI number.

## B.    CT Images Under Harris's NPI Number

The court reaches the opposite result for the CT images billed under Harris's NPI number. To support his assertion that ACC improperly used Harris's NPI number to bill Medicare under Code 77014, Scarbrough points to image guided radiation therapy provided to Harris's patient J.W. (Doc. 41, ¶ 123). Scarbrough says that J.W., a Medicare patient, received two image guided radiation therapy treatments per day, five days a week. (*Id.*). He then says that before each of these treatments, J.W. received a CBCT image that was billed to Medicare under Harris's NPI number. (*Id.*). But Harris did not know that ACC was billing Medicare for these services and did not sign the images as required to bill for the service. (*Id.*). Instead, a radiation technician at the ACC Anniston office signed these images under Harris's NPI number. (*Id.*). And these forged signatures weren't executed until weeks after the service was performed. (*Id.*). For example, the CBCT image performed on May 17, wasn't signed until May 31. (*Id.*).

Under Rule 9(b), it isn't enough to generally allege that a patient was a Medicare beneficiary and his insurance was billed under a fraudulent scheme. *See United States ex rel. McKoy v. Atlanta Primary Care Peachtree, P.C.*, 2025 WL 1823269, at *7 (11th Cir. July 2, 2025). Instead, a relator must provide "specific information about the submission of claims to the Government." *See Clausen*, 290 F.3d at 1311. Because Scarbrough doesn't plead any facts to support his conclusory assertion that ACC billed Medicare for J.W.'s CBCT images, the court **GRANTS** ACC's motion to dismiss the Code 77014 allegations related to the billing for services under Dr. Harris's NPI number. *See id.* at 1312 (affirming dismissal of complaint that discussed in detail a handful of patients' lab results but that offered no factual basis for conclusory allegation that the defendant billed claims related to those lab results to the Government). As with Scarbrough's Sengar and Sehbai-related Code 77427 allegations, the court's dismissal of the Harris-related Code 77014 allegations will be **WITH PREJUDICE**.

## III.  Claims for IMRT Services (Code 77301, 77338, G6015, G6016)

The final alleged fraudulent scheme relates to ACC's submission of claims for IMRT services from 2016 to 2020. According to Scarbrough, these claims were false because ACC stopped performing required patient specific QA in 2016 and thus the IMRT services provided weren't reasonable or medically necessary. In Part I, the court found that Scarbrough adequately alleged under Rule 9(b) that ACC and Sanford submitted claims for services using ACC's new software only verification process. But the court found that Scarbrough hadn't adequately alleged that (a) Sengar submitted or caused to be submitted claims for reimbursement for IMRT services, or (b) the claims ACC and Sanford submitted were objectively false. Thus, the court dismissed without prejudice Scarbrough's IMRT services' allegations.

In his amended complaint, Scarbrough repleads his IMRT services claims against ACC and Sanford.[1] ACC and Sanford say that the court should dismiss these claims for failing to establish presentment, falsity, or scienter.

---

[1] Scarbrough's response brief clarifies that he "does not seek to prosecute FCA IMRT claims against Dr. Sengar." (Doc. 46, p. 29). So the court **DISMISSES WITH PREJUDICE** the amended complaint's IMRT allegations against Sengar.

The court stands by its ruling in Part I that Scarbrough adequately alleges that ACC and Sanford submitted claims for services using ACC's new software-only verification process. Again, Scarbrough alleges with particularity that ACC removed patient specific QA at *all* ACC facilities in January 2016. And Scarbrough has shown that Medicare billing data establishes that Sanford and other ACC physicians billed Medicare for IMRT services from 2016 to 2020. Thus, the court rejects ACC and Sanford's argument that Scarbrough has failed to plead with particularity that ACC and Sanford submitted claims for IMRT services using the software-only verification process. The court addresses ACC and Sanford's falsity and scienter arguments below.

## A.  Falsity

Scarbrough says each of ACC's claims for IMRT services from January 2016 onward were false because Medicare doesn't reimburse providers for services that aren't "reasonable and necessary for the diagnosis or treatment of illness or injury." *See* 42 U.S.C. § 1395y(a)(1)(A). A service is "reasonable and necessary" if "the service has been proven safe based on authoritative evidence . . . or . . . is generally accepted in the medical community as safe and effective for the condition for which it is used." 54 Fed. Reg. 4302, 4304 (Jan. 30, 1989). Thus, to show that ACC and Sanford submitted false claims for IMRT services, Scarbrough must plausibly allege that it was false to certify that ACC's QA testing procedures were generally accepted in the medical community as safe and effective. *See* 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B).

In Part I, the court dismissed Scarbrough's IMRT services claims on falsity grounds because Scarbrough alleged that the QA process for IMRT services requires patient specific end-to-end testing using a phantom or equivalent testing procedure but failed to adequately explain why the medical community wouldn't accept ACC's software verification system as an equivalent testing procedure. The amended complaint clarifies that the medical community considers IMRT services safe and effective only if a medical provider (1) verifies "that the <u>calculated</u> beams or arcs are delivered to a phantom or a dosimetry measuring device; and" (2) confirms "that the intended dose will be accurate and feasible in accordance with the patient's specific treatment plan." (Doc. 41, ¶ 158 (emphasis in original)).

According to Scarbrough, ACC's software verification system does not follow these procedures because it does not verify the radiation delivery machines via physical phantoms or a calibrated dosimetry measuring device. (*Id.*, ¶¶ 155–58). Nor is ACC's use of a virtual phantom, which does not include the patient's custom designed treatment plan, equivalent to irradiating the physical phantoms that the medical community deems safe and effective. (*See id.*, ¶¶ 159–60, 168–70). To support these allegations, Scarbrough cites a practice guideline from the American College of Radiology and American Society for Radiation Oncology plus LCD L39553. (*Id.*, ¶¶ 145–48). The practice guideline says that "[b]efore the start of treatment and using all of ***the parameters of the patients' treatment plan***, the accuracy of dose delivery should be documented by irradiating a phantom containing a calibrated dosimetry system to verify that the dose delivered is the dose planned." (*Id.*, ¶ 145 (emphasis added)). LCD L39553 explains that "[t]he distinguishing feature of an IMRT plan is that it demonstrates how treatment with non-uniform beam intensities will be delivered." (*Id.*, ¶ 147 (emphasis omitted)). It then adds that "calculated beams or arcs" should be "delivered to a phantom or a dosimetry measuring device to confirm the intended dose will be accurate and that delivery will be technically feasible." (*See id.* (emphasis omitted)).

On their face, Scarbrough's allegations plausibly allege that the medical community wouldn't generally accept ACC's software only verification system, which fails to consider the patient's specific treatment plan, as a safe and effective IMRT QA process. But for three reasons Defendants say Scarbrough has not "plausibly allege[d] that the specific form of patient-specific end-to-end testing that he insists was 'required' by Medicare in order to properly submit a claim for reimbursement for IMRT treatment was in fact required." (Doc. 44, p. 32). First, Defendants point out that LCD L39553 wasn't established until December 2023 and that LCDs are non-binding guidelines that do not carry the force of law. Second, Defendants say that Scarbrough hasn't alleged that Medicare adopted the practice guideline before issuing the LCD or provided an alternative reason for why following the guideline was required to receive Medicare reimbursement. Finally, Defendants say that Scarbrough cannot rely on this practice guideline because the guidelines themselves recognize that "an approach that differs from the guidelines, standing alone, does not necessarily imply that the approach was below the standard of care." (*Id.*, p. 34).

But ACC and Sanford's challenges to the LCD and practice guidelines merely highlight a fact dispute over whether the medical community would consider ACC's IMRT QA process safe and effective. True, the LCD is non-binding and wasn't in effect during the time relevant to ACC and Sanford's alleged submission of false claims. But Scarbrough alleges that the LCD "essentially adopts the decades old industry standards" for IMRT services. (Doc. 41, ¶ 146). And Medicare needn't have adopted the practice guideline for it to support Scarbrough's contention that ACC's procedures for IMRT services aren't generally accepted. Plus, while the practice guidelines say that a different approach doesn't necessarily fall below the standard of care, this statement doesn't definitively establish that the medical community would accept ACC's IMRT procedures as safe and effective.

"[F]actual disputes are not grounds for dismissal at" the motion-to-dismiss stage. *See Vargas*, 134 F.4th at 1160. And this court must "accept the complaint's well-pleaded allegations as true and draw all reasonable inferences in the relators' favor." *See id.* at 1159. Viewing the amended complaint in the light most favorable to Scarbrough, he has adequately alleged that it was false to claim that ACC's QA testing procedures were generally accepted in the medical community as safe and effective. So the court rejects the argument that it should dismiss the IMRT services claims on falsity grounds.

## B.    Scienter

ACC and Sanford finally assert that Scarbrough has failed to adequately allege that they knew their claims for reimbursement for IMRT services were false because ACC's QA testing procedures are not generally accepted as safe and effective. The court disagrees. Again, the False Claims Act's scienter requirement is satisfied when someone acts with either actual knowledge, deliberate ignorance, or reckless disregard. *See* 31 U.S.C. § 3729(b)(1). A defendant is deliberately ignorant if he is "aware of a substantial risk that" his "statements are false, but intentionally avoid[s] taking steps to confirm the statements truth or falsity." *Supervalu Inc.*, 598 U.S. at 751. And a defendant acts with reckless disregard when he is "conscious of a substantial and justifiable risk that" his "claims are false, but submit[s] the claims anyway." *Id.* Plus, under Rule 9(b), a defendant's knowledge can be alleged generally. *See* Fed. R. Civ. P. 9(b).

The amended complaint adequately alleges that ACC and Sanford were aware of a substantial and justifiable risk that their QA process for IMRT services was deficient and in violation of Medicare Conditions of Payment. To be certain, in April 2017, Scarbrough says he emailed Mills and Sanford to tell them that he believed ACC's procedures violated Medicare's requirements. (Doc. 41, ¶ 165). And in this email, Scarbrough highlighted why he believed ACC failed to meet the medical community's requirements for IMRT QA. (*Id.*, ¶ 166). According to Scarbrough, Mills responded to Scarbrough's email by paying "mere lip service to the idea of patient specific QA procedures." (*Id.*, ¶ 173). And nothing in the amended complaint suggests that Sanford ever took any steps to confirm that the IMRT services he was billing for included a safe and effective QA process. Accepting these allegations as true, they plausibly suggest that ACC and Sanford acted with either deliberate ignorance or reckless disregard of whether their claims that the IMRT QA process was generally accepted by the medical community as safe and effective were false. So the court will **DENY** ACC and Sanford's motion to dismiss the IMRT services-related allegations.

## CONCLUSION

For these reasons, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss (doc. 44). These claims will proceed through discovery:

1. The Sanford-related radiation treatment management claims against ACC and Sanford;
2. The Scarbrough-related Image Guided Radiation Therapy claims against ACC; and
3. The IMRT services claims against ACC and Sanford.

All other claims are **DISMISSED WITH PREJUDICE**. ACC and Sanford will have until on or before **February 10, 2026,** to answer the amended complaint.

The court will enter a separate order that carries out this ruling and directs the Clerk of Court to terminate Sengar as a defendant listed on the docket sheet.

**Done** on January 27, 2026.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE